United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNNEX CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>MARK J. WATTLES,<br><br>    Defendant. | Case No.: 11-cv-01496-YGR<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is Plaintiff's motion for summary judgment. On March 9, 2011, Plaintiff Synnex Corporation ("Synnex") brought this action for breach of contract against Defendant Mark J. Wattles ("Wattles") based on a guaranty agreement. (Dkt. No. 1 ("Complaint" or "Compl.").)[1] Synnex filed a Motion for Summary Judgment on August 20, 2012. (Dkt. No. 124 ("Motion" or "Mot."); Dkt. No. 107 (original Motion).) Wattles filed his Response in Opposition to Plaintiff Synnex Corporation's Motion for Summary Judgment on September 18, 2012. (Dkt. No. 121 ("Opposition" or "Opp.").) On September 25, 2012, Synnex filed its Reply in Support of Motion for Summary Judgment. (Dkt. No. 122 ("Reply").) The Court held oral argument on October 30, 2012. (Dkt. No. 131.)

Having carefully considered the papers submitted and the pleadings in this action, the arguments of counsel, and for the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Summary Judgment.

---

[1] Wattles filed a Counterclaim against Synnex on May 9, 2011, alleging breach of the covenant of good faith and fair dealing, civil conspiracy, and declaratory relief/rescission. (Dkt. No. 12.) The pending Motion for Summary Judgment does not address any of the Counterclaims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Wattles served as the chairman of Ultimate Acquisition Partners LP, which did business as Ultimate Electronics ("Ultimate"), a retail electronics store. (Videotape Deposition of Mark J. Wattles ("Wattles Dep.") 20:10–21:15, attached as Ex. A to Declaration of Ryan E. Warren, Esq. to Defendant Mark J. Wattles' Response and Responsive Separate Statement in Opposition to Plaintiff Synnex Corporation's Motion for Summary Judgment ("Warren Decl.") (Dkt. Nos. 128 and 121-1).) In 2009, Ultimate entered into a contract with Hewlett Packard ("HP"), whereby HP agreed to invest $100 million in Ultimate in exchange for (1) a 25% stake in Ultimate, and (2) Ultimate's guaranteed sales of a certain number of HP's products ("HP Deal"). In order to create a competitor to Best Buy, HP agreed to distribute the $100 million in three installments of $50 million, $30 million, and $20 million. (Wattles Dep. 68:24–69:10.) Funding was contingent on Ultimate's success in opening a certain minimum number of stores and each store's success in selling a certain number of HP products. (*See* Wattles Dep. 24:17–22; Warren Decl., Ex. C (Contribution Agreement) (Dkt. No. 121-3) §§ 1.2(b)–(e).) The parties further agreed that the terms of the deal would remain confidential. (Contribution Agreement § 5.1; Wattles Dep. 68:24–69:3.)[2]

The HP Deal consisted of three contracts: the Launch Agreement, Contribution Agreement, and Reseller Agreement. (Wattles Dep. 26:8–28:24.) The Reseller Agreement provided that HP would sell its products directly to Ultimate. (Warren Decl., Ex. B (Reseller Agreement) (Dkt. No. 121-2) §§ 7(A)–(G).) The Reseller Agreement also contained payment and security terms but did not require Wattles to sign a personal guaranty. (*See id.* § 6.)

After executing the three HP agreements, HP Senior Vice-President John Soloman ("Soloman") informed Wattles that HP would not sell its products directly to Ultimate as the Reseller Agreement required. (Wattles Dep. 29:7–32:6.) Instead, Ultimate would have to purchase HP

---

[2] Wattles claims that section 5.1 of the Contribution Agreement provides a general nondisclosure agreement that prevented either party from discussing the terms of the HP Deal with anyone else. However, the text of the provision cited does not prohibit any and all disclosures. Instead, it merely states that "neither the Company nor the Investor shall issue any press release or other public statement relating to this Agreement or the Related Agreements or the transactions contemplated hereby or thereby without the prior approval of the other party." (*See* Contribution Agreement § 5.1.)

2

products from HP's exclusive distributor, Synnex (via New Age Electronics).[3]  (Wattles Dep. 29:7–32:6.)  In order to buy the product directly from Synnex, Ultimate and Synnex entered into a Credit Application Agreement.  (RSS No. 1.)[4]  Within a few months after the HP Deal was executed, and as part of the extension of credit, Synnex required a personal guaranty from Wattles.  (Wattles Dep. 34:5–20.)

Wattles contacted HP's Soloman to complain, arguing no personal guaranty should be required.  (Wattles Dep. 35:6-16.)  Soloman replied that the guaranty was somewhat irrelevant because (i) it was a temporary measure until HP had implemented the necessary systems to permit direct sales to Ultimate and (ii) HP had provided $50 million in cash.  (*Id.* 35:2–36:1 (Soloman told Wattles he should not "worry about it").)  Wattles "fundamentally agreed" with Soloman's assessment, and thereupon signed the personal guaranty for $5.7 million ("Initial Guaranty").  (*Id.*)  Wattles understood that he was personally at risk for any unpaid payments by Ultimate to Synnex.  (*Id.* 39:2–14.)  Wattles had signed numerous other personal guarantees with respect to other electronics and appliance vendors, including Sony, Sharp, Samsung, Toshiba, Panasonic, and Whirlpool, among others.  (*Id.* 36:2–24, 37:4–8.)

Sometime in mid-2010, HP provided Ultimate with an additional $30 million in capital. Thereafter, Synnex asked Wattles to increase the amount of his guaranty to $15 million.  (Wattles Dep. 51:5–16.)  Wattles tried to contact Todd Bradley (to whom Soloman reported) but, characteristically, he did not respond.  (*Id.* 57:12–24.)  Lacking time, Wattles did not further investigate the consequences of refusing to sign the new guaranty.  (Wattles Dep. 72:20–73:4.) Wattles executed the Unconditional Continuing Guaranty ("Continuing Guaranty"), dated July 28, 2010, guaranteeing personal liability to Synnex and its affiliates for up to $15 million.  (RSS No. 3;

---

[3] New Age Electronics is a wholly-owned division of Synnex. In this Order, the term "Synnex" describes both Plaintiff Synnex and New Age.

[4] As used in this Order, "RSS No. #" refers to material facts and responses set forth in Defendant Mark J. Wattles' Responsive Separate Statement in Opposition to Plaintiff Synnex Corporation's Motion for Summary Judgment. (Dkt. No. 127.) Unless otherwise noted, the references to the material fact numbers or responses include the evidence supporting the same.

Declaration of Simon Leung ("Leung Decl.") (Dkt. No. 107-4) ¶ 4 and Ex. 2 (Unconditional Continuing Guaranty); Wattles Dep. 51:5–11.)

By December 2010, Ultimate owed Synnex a balance of $11,121,728.00. (RSS No. 4; Leung Decl. ¶ 5 and Ex. 5.)[5] Synnex agreed to a payment plan under which Ultimate would pay $1,700,000 per week, subject to fluctuation based upon continuing sales and adjustments. (RSS No. 4; Leung Decl. ¶ 5 and Ex. 5.) Ultimate paid the agreed amounts from December 3, 2010 to January 6, 2011. (RSS No. 4; Leung Decl. ¶ 5 and Ex. 5.) On January 14, 2011, Ultimate failed to make its weekly payment. (RSS No. 5; Leung Decl. ¶ 6.) On January 19, 2011, Synnex issued a written demand to Wattles for immediate payment of Ultimate's outstanding liability of $5,653,826.73. (RSS No. 6.) Wattles received the demand but has made no payments to Synnex. (RSS No. 7.)

On January 26, 2011, Ultimate filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. (RSS No. 8.) Pursuant to the Continuing Guaranty, Wattles' obligation remained in force and effect notwithstanding Ultimate's bankruptcy petition. (*See* RSS No. 10.)

By its Motion, Synnex contends the Court should find that Wattles liable for $5,653,826.73, plus reasonable attorney's fees and costs. (RSS No. 14; Leung Decl. ¶ 13.) In total, Synnex seeks an entry of judgment for $ 5,695,734.01. (Mot. at 14.) Wattles opposes the motion on the grounds that questions of material fact exist as to whether the guaranty agreement is void for duress and/or lack of consideration. (Opp. at 6–10.)

## II.   EVIDENTIARY ISSUES

At oral argument, Wattles' counsel argued that summary judgment should be denied because Synnex failed to properly authenticate its evidence in support of its Motion. The Court has reviewed the record and determined the evidence was properly authenticated. The initial confusion arose because both parties attached their underlying evidence *en masse* as exhibits to their briefs. (Dkt. No.

---

[5] Although Wattles disputes RSS Nos. 4 and 5, he presents no evidence that substantively disputes the amount owed, the payment schedule, that payments were made under the schedule, or when the payments ceased. (*See* RSS Nos. 4 and 5.) In fact, Wattles' testimony indicates he has no personal knowledge of the specific amounts owed by Ultimate to Synnex at the time of the bankruptcy filing. (Wattles Dep. 61:9–15, 62:6–8; *see* responses to RSS Nos. 4 and 5 ("he does not have a general idea of the amount").)

125.)  As to Synnex's evidence, the Leung Declaration—which was filed as Exhibit 10 to the brief and authenticates Exhibits 1–2 and 5–7—was buried *within* Synnex's exhibits and was not filed in accordance with common practices in this district.  In response to numerous explicit requests from the Court that Synnex authenticate its evidence (*see* Dkt. Nos. 125 and 130), Synnex failed to direct the Court to the Leung Declaration until oral argument.  Upon review of the Leung Declaration, Exhibits 1–2 and 5–7 have been properly authenticated.  The Court finds no authentication of Synnex's Exhibit 3 (Videotape Deposition of Mark J. Wattles), but Wattles' counsel has authenticated a copy of the same transcript with his own evidence.  Synnex's Exhibit 4 (Mark J. Wattles' Response to First Set of Requests for Admission) has not been authenticated, but based on a lack of objection to the document in the Responsive Separate Statement (*see* RSS No. 3), the Court finds no objection to the authenticity of this exhibit.  For these reasons, the Court will consider Synnex's evidence in deciding this Motion.  The same is true of Wattles' evidence in support of his Opposition, based on Wattles' counsel's declaration and lack of objection thereto.  (Dkt. No. 128.)

### III.    DISCUSSION

#### A.    Standard for Motion for Summary Judgment under Fed. R. Civ. P. 56

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v.*

*Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-moving party bears the burden of proof at trial, the moving party can prevail merely by demonstrating that the non-moving party lacks evidence to support its case.  *Soremekun v. Thrifty Payless, Inc*, 509 F.3d at 984.  If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion.  *Id.* (quoting *Anderson*, 477 U.S. at 250).  The opposing party's evidence must be more than "merely colorable" but must be "significantly probative."  *Id.* at 249–50.  Further, that party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows a genuine issue of material fact exists for trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000); *Nelson v. Pima Cmty. College Dist.*, 83 F.3d 1075, 1081–1082 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("conclusory allegations unsupported by factual data are insufficient to defeat [defendants'] summary judgment motion").

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011).  However, in determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).  Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment."  *See id.*; *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.")

**B.     Economic Duress**

**1.     Summary of the Arguments**

Synnex contends summary judgment is appropriate given that Wattles entered into the Continuing Guaranty, agreed to be personally liable for any unpaid amounts due to Synnex from Ultimate, and specific amounts are now due and owing.  (Mot. at 12–14.)  Wattles asserts only that he

executed the guaranty out of a fear of losing his business, which would have resulted had he breached the HP Deal. (Opp. at 9.) Wattles further argues that Synnex exploited its knowledge of confidential terms of the HP Deal to coerce him to sign the personal guarantees. (*Id*. at 8–9.) Faced with no reasonable alternative and his business on the line, Wattles concludes that, under California law, the record presents a question of fact as to whether he acted under economic duress. (*Id*. at 9-10.) In response, Synnex counters that Wattles cannot show duress based on the facts in the record. Specifically, Synnex emphasizes that it was HP who allegedly made misrepresentations to Wattles (if anyone), and that Wattles signed the guarantees without any alleged coercion from Synnex itself. (Reply at 4–5.)

### 2. Law of Economic Duress

A guaranty is subject to ordinary defenses to contract formation including economic duress. Economic duress does not require an unlawful act, but may come into play upon the doing of a wrongful act which is sufficiently coercive "to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *See Perez v. Uline, Inc*., 157 Cal. App. 4th 953 (Cal. Ct. App. 2007); *Thompson Crane & Trucking Co. v. Eyman*, 123 Cal. App. 2d 904, 908 (Cal. Ct. App. 1954). "A party pleading economic duress must have had no reasonable alternative to the contract it seeks to avoid." *CrossTalk Productions, Inc. v. Jacobson*, 65 Cal. App. 4th 631, 644 (Cal. Ct. App. 1998). If a reasonable alternative was available, economic duress cannot be established. *Id.*

Whether a party acted under duress is normally a question of fact, and courts in California apply an objective standard to determine if a reasonable alternative was available. *See Thompson Crane*, 123 Cal. App. 2d at 910. Generally, courts only apply the doctrine of economic duress reluctantly and "only as a last resort to correct exploitation of business circumstances when conventional alternatives and remedies are unavailing." *Rich & Whillock, Inc. v. Ashton Development Inc.*, 157 Cal. App. 3d 1154, 1159 (Cal. Ct. App. 1984).

While the law allows for a certain degree of subjectivity in determining whether a contract is voidable for duress, the century-old doctrine requires the party claiming duress to show *some wrongful act* on the part of the alleged perpetrator. *See McTigue v. Arctic Ice Cream Supply Co.,* 20

7

Cal. App. 708, 719 (Cal. Ct. App. 1912) (party's refusal to release horses sold as assets of a delivery business until the purchaser paid $350 for expenses incurred in horses' care held to be duress as a third-party, not the corporate-seller, had incurred the debt); *Steffen v. Refrigeration Disc. Corp.*, 91 Cal. App. 2d 494, 500 (Cal. Ct. App. 1949) (finding economic duress where defendant forced mortgagor to pay unearned interest to secure a release of the mortgage where the mortgagor needed to sell the property to avoid foreclosure); *McNichols v. Nelson Valley Bldg. Co.*, 97 Cal. App. 2d 721, 724 (Cal. Ct. App. 1950) (duress found where party refused to remove a wrongfully filed lis pendens as a means of exacting the conveyance of other property as a condition to dismissing the action); *Ezmirlian v. Otto*, 139 Cal. App. 486, 496 (Cal. Ct. App. 1934) (finding duress where a party recorded an invalid conveyance and refused to remove the resulting cloud on title unless the grantee paid part of the proceeds of a pending sale to said party); *Thompson Crane*, 123 Cal. App. 2d at 908 (payment recoverable for duress where one party wrongfully refused to file a protest with the Treasury in order to coerce the taxpayer to sign a contingency agreement for additional fees).

Economic duress requires both knowledge of the affected party's economic circumstances and actual inducement thereof. *See Steinman v. Malamed*, 185 Cal. App. 4th 1550, 1558–59 (Cal. Ct. App. 2010); *Louisville Title Ins. Co. v. Surety Title & Guaranty Co.*, 60 Cal. App. 3d 781, 801 & 805 (Cal. Ct. App. 1976). Typically, it is not duress for a party to threaten either to refuse to proceed under a contract or civil litigation. *Nesbitt Fruit Products, Inc. v. Del Monte Beverage Co.*, 177 Cal. App. 2d 353, 361 (Cal. Ct. App. 1960) (citing *Sistrom v. Anderson*, 51 Cal. App. 2d 213, 221 (Cal. Ct. App. 1942); *Marshall v. Packard-Bell Co.*, 106 Cal. App. 2d 770, 774 (Cal. Ct. App. 1951); *Leeper v. Beltrami*, 53 Cal. 2d 195, 205–06 (1959)).

### 3. Application

As summarized above, Wattles argues duress on the theory that Synnex leveraged its knowledge of the confidential terms of the HP Deal to force Wattles to agree to the guarantees. (Opp. at 8–9.) Specifically, Wattles contends that Synnex principal Adam Carroll ("Carroll") knew that Ultimate was required to purchase minimum quantities of HP products to satisfy requirements of the HP Deal and exploited that knowledge to time the guaranty demands. (Wattles Dep. 42:20–43:23,

54:19–55:5, 71:20–72:1.)[6] Wattles maintains that he had "no choice" but to sign both guarantees because Ultimate would have been in breach of its obligations to HP, from whom Ultimate already had received $80 million. (*Id.* 40:13–25.) Wattles further claims he attempted to address the issue with HP to no avail, as Soloman (who had been his HP contact) was no longer involved with the business relationship and it was unclear who had assumed his authority. (*Id.* 56:11–25.)

Wattles relies heavily on *Rich & Whillock, Inc. v. Ashton Development, Inc.* for the proposition that entering into certain unfavorable contracts, when faced with the imminent collapse of one's business as the sole alternative, may be grounds for economic duress. That case involved an action to recover a balance due for rock and excavation work. *Rich & Whillock*, 157 Cal. App. 3d at 1156. After signing an initial agreement to complete excavation work for the defendant, plaintiff discovered that rock blasting would be necessary to complete the job. *Id.* Because the terms of the excavation agreement specifically excluded blasting, plaintiff informed defendant of the additional amount due for the extra work. *Id.* Defendant agreed to the increased price. Once the final balance was due, defendant refused to pay, claiming his company was out of money. *Id.* Defendant offered plaintiff a settlement for little more than 75% of the amount due and told plaintiff it could either accept or sue the defendant for the full balance. *Id.* Throughout their discussions, plaintiff repeatedly emphasized that as a new, small company, the job at issue had forced them to incur significant liabilities and failure to pay would destroy the company. *Id.* Given the choice of accepting the settlement or losing their company, plaintiff relented, accepted the lower amount, and signed a release, but later sued to void the release for duress and recover the unpaid balance. *Id.*

The *Rich & Whillock* court held for plaintiff on the basis that it signed the release under economic duress. *Id.* at 1160. The core of the decision focused on the Court's finding that

---

[6] At oral argument, Wattles' counsel suggested that Carroll "bragged" to Wattles about his knowledge of the confidential HP Deal. However, no evidence supports counsel's characterization. By contrast, Wattles testified merely that Carroll "described the transaction" to him. (Wattles Dep. 43:2.) Carroll knew that "Hewlett-Packard had invested capital in [Ultimate] and that Hewlett-Packard had minimum purchase requirements in order for [Ultimate] to continue to get capital from Hewlett-Packard" (*id.* 43:19–23), and that Ultimate and Synnex "had to get things moving very quickly." (*See generally* Wattles Dep. 42:20–44:10.) Even construing in the light most favorable to Wattles that Carroll was "intimately familiar" with the HP-Ultimate relationship, knowledge itself does not constitute "bragging." (*Id.* 54:19–55:5.)

9

defendant's refusal to pay and subsequent settlement offer were not made in good faith. *Id.* The following factors persuaded the Court: (1) defendant never disputed the amount owed; (2) defendant was fully aware that plaintiff was a new company, overextended to creditors and subcontractors and faced with imminent bankruptcy if not paid; (3) plaintiff strenuously protested defendant's course of tactics; and (4) plaintiff succumbed only to avoid economic disaster and the adverse ripple effects of its bankruptcy on those to whom it was indebted. *Id.* at 1160–61.

Here, *Rich & Whillock* is distinguishable. The evidence in this case indicates that Synnex merely requested the guarantees as a condition of extending credit, a common business practice when a borrower's creditworthiness is suspect. Wattles admits that Ultimate was suffering from negative cash flows, as shown in Ultimate's application for credit from Synnex, in which Ultimate agreed to release two years' worth of financial statements. (*See* Leung Decl. ¶ 3 and Ex. 1 (Credit Application Agreement) at 3.) Further, Wattles concedes that a demand for a personal guaranty was far from unusual with respect to Ultimate's business. Wattles had signed personal guarantees with at least nine other Ultimate suppliers. (Wattles Dep. 36:2–24, 37:4–8.) Wattles himself admitted that he "fundamentally agreed" with Soloman's perspective on the need for the Initial Guaranty and, on that basis, he signed. (Wattles Dep. 35:9–36:1.) Wattles' self-serving arguments notwithstanding, Wattles has not proffered probative evidence that Synnex requested the guarantees for any reason other than one based upon Ultimate's financial history.

Additionally, with respect to the Initial Guaranty, Wattles testified at his deposition that it was HP's Soloman, not anyone from Synnex, who told Wattles the guaranty was of no concern and assured him that it was only temporary. (Wattles Dep. 35:2–36:1.) Aside from Wattles' assertion that Synnex somehow exploited its knowledge of the HP Deal, the record shows no facts of coercive or otherwise wrongful conduct on Synnex's part. With respect to the Continuing Guaranty, Wattles testified that he increased the amount of the personal guaranty to $15 million in response to Synnex's "threat" to cease its credit extension to Ultimate. (Wattles Dep. 53:15–54:18, 73:18–74:4.) However, as discussed above, without more, a party may enforce the terms of a valid contract or threaten litigation. *Nesbitt Fruit Products, Inc.,* 177 Cal. App. 2d at 361.

1   While Wattles claims that Synnex exploited its knowledge of the HP Deal to time its guaranty requests so as to ensure Wattles complied, he never protested or questioned the conduct to anyone at Synnex.  Further, he has not shown that Synnex was ever aware that Ultimate was faced with imminent bankruptcy if Wattles did not sign the guarantees.  No reasonable juror would consider Wattle's lack of protest and interaction with Synnex before signing the guarantees to resemble, in any way, the type of strenuous protest which had occurred in *Rich & Whillock* or to support the defense of economic duress.  *See* 157 Cal. App. 3d at 1160–61.

### C.     Lack of Consideration

As an additional defense, Wattles argues in a footnote—and with little elaboration—that the guaranty agreement lacked consideration and is therefore unenforceable under Cal. Civ. Code section 1550.[7]  (Opp. at 9 n.3.)  Specifically, he argues that Synnex was merely obligating to do what third-party HP was already required to do under its own agreements with Ultimate—namely, to provide products to Ultimate.  (*Id.*)  Synnex did not respond to this argument in its Reply.   However, at oral argument, Plaintiff's counsel responded that Synnex's extension of credit in exchange for the guaranty represents sufficient consideration.

Wattles is correct that "[a] promise is not enforceable unless consideration was given in exchange for the promise."  *US Ecology, Inc. v. State of California*, 92 Cal. App. 4th 113, 128–29 (Cal. Ct. App. 2001) (citing *Passante v. McWilliam* 53 Cal. App. 4th 1240, 1247 (Cal. Ct. App. 1997)).  Generally, a promise to perform a pre-existing legal duty is not legally sufficient consideration.  *Id.* (citing *Bailey v. Breetwor*, 206 Cal. App. 2d 287, 291–292 (Cal. Ct. App. 1962)).  Consideration must be an act or promise-in-return, bargained for and given in exchange for the initial promise.  *Simmons v. Cal. Institute of Technology*, 34 Cal. 2d 264, 272 (1949).

The Court finds that because Wattles provided his guaranty in exchange for an extension of credit from Synnex, the requirement of consideration is satisfied.  Synnex was not a party to the HP Deal, and therefore had no obligation to extend credit to Ultimate.  (*See* Wattles Dep. 76:1–10 ("generally credit applications are being filled out for the purpose of extending credit to a retailer").)  Consequently, by agreeing to extend credit to Ultimate in exchange for Wattles' personal guaranty,

---

[7] Cal. Civ. Code section 1550 states "it is essential to the existence of a contract that there should be . . . sufficient cause or consideration."

11

Synnex provided sufficient consideration. Accordingly, Wattles has not presented any triable issue of fact regarding the lack of consideration.

## III. DAMAGES

Synnex seeks an entry of judgment against Wattles for $5,695,734.01. (Mot. at 14.) That amount is inclusive of Wattles' outstanding liability to Synnex ($5,653,826.73), Synnex's attorney's fees ($34,710) and costs ($7,197.28). (Opp. at 14; RSS Nos. 12 and 14–15.) Wattles has presented no facts disputing the amount of Ultimate's, and by extension, his outstanding obligations. (*See* Responses in RSS.) Accordingly, the Court finds Wattles concedes the actual amount due of $5,653,826.73. However, in order to obtain reasonable attorney's fees, costs, and/or expenses, Synnex must comply with all applicable procedures set forth in the Local Rules.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and awards damages totaling $5,653,826.73.

This Order terminates Dkt. No. 124.

**IT IS SO ORDERED.**

Dated: November 14, 2012

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**